**COLD SPRING HARBOR LABORATORY, Plaintiff,**

v.

**ROPES & GRAY LLP and Matthew P. Vincent, Defendants.**

**No. 10–CV–661 (ADS)(AKT).**

United States District Court, E.D. New York.

Jan. 22, 2011.

Scully, Scott, Murphy & Presser, P.C. by Peter I. Bernstein, Esq., Chad E. Ziegler, Esq., of Counsel, Garden City, NY, for Plaintiff.

Patterson Belknap Webb & Tyler LLP, by Philip R. Forlenza, Esq., Eugene M. Gelernter, Esq., Nicolas Commandeur, Esq., Irena Royzman, Esq., Of Counsel, New York, NY, for Defendant Ropes & Gray LLP.

L'Abbate, Balkan, Colavita & Contini, L.L.P., by Anthony P. Colavita, Esq., Scott E. Kossove, Esq., Of Counsel, Garden City, NY, for Defendant Matthew P. Vincent.

Sherin and Lodgen LLP by Robert J. Muldoon, Esq., Thomas W. Kirchofer, Esq., Of Counsel, Boston, MA, for Defendant Matthew P. Vincent.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On February 16, 2010 Cold Spring Harbor Laboratory ("CSHL" or "the Plaintiff") commenced this action against Ropes & Gray LLP ("R & G") and Matthew P. Vincent ("Vincent" and collectively "the Defendants"), asserting causes of action for legal malpractice, breach of fiduciary duty and fraud based on the Defendants actions in drafting and prosecuting a patent for technology developed by CSHL employee Dr. Gregory Hannon. Presently before the court is: 1) the Defendants' motion to dismiss pursuant to Fed. R. Civ. P(12)(b)(3) for improper venue; 2) the Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim; and 3) the Plaintiff's motion to amend the complaint. As set forth below, the Court finds that venue is improper and transfers this case to the District of Massachusetts. Because the Court finds venue improper, the Court does not address the Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) or the Plaintiff's motion to amend the complaint.

### I. BACKGROUND

The following facts are drawn from the complaint and the Declaration of Dr. Gregory Hannon dated April 16, 2010 ("Hannon Declaration"). These facts are not findings of fact by the Court, but rather are assumed to be true for the purpose of deciding this motion and are construed in a light most favorable to the Plaintiff.

### A. The Initial Relationship between the Parties and the Patent Applications

The plaintiff CSHL is a New York education corporation and research facility principally located in Cold Spring Harbor, New York. This case involves a number

of inventions that exploit a cellular mechanism called RNA interference ("RNAi") developed by Dr. Gregory Hannon, a Professor and Howard Hughes Medical Institute Investigator at CSHL, and his colleagues at CSHL (collectively "Dr. Hannon"). RNAi "refers to the process by which double stranded RNA functions to help regulate when genes are turned off and on in the cell." (Compl., ¶ 7.) Based on his RNAi research, Dr. Hannon invented methods and technologies to use short hairpin RNAs ("shRNA") in human and other mammalian cells. The shRNA technology "gives researchers the ability to specifically turn off expression of virtually any target gene or combination of target genes in a mammalian cell," and has become a "fundamental tool in biomedical research for studying what genes do in cells, what goes wrong in diseases such as cancer and for identifying drug targets." (Compl., ¶ 7.) In or about 1999, CSHL decided to obtain patents on Dr. Hannon's work in the RNAi field.

On October 7, 1999, Dr. Hannon attended a meeting at CSHL with Vincent, a registered patent attorney and a partner in the Intellectual Property Group at the law firm of Ropes & Gray. Vincent was a resident of the State of Massachusetts, and primarily worked in R & G's offices in Boston, Massachusetts. At this meeting, the parties discussed patenting strategies based on Dr. Hannon's "preliminary experiments studying the mechanism of RNAi in drosophila cells and general discussions concerning the potential application for and intellectual property value of RNAi technology." (Hannon Decl., ¶ 6.) Shortly after this meeting, CSHL engaged the Defendants to handle future patent applications with regard to the RNAi technology that Dr. Hannon was still developing.

As an initial matter, the Court notes that the complaint does not clearly identify when Dr. Hannon first conceived of the methods and technologies that serve as the basis for the inventions and patent applications. Based on the Plaintiff's representations in the complaint and the Hannon Declaration, it appears that Dr. Hannon conceived of the potential uses of RNAi in mammalian cells between 1999 and 2000 (Hannon Decl., ¶ 7), and discovered the potential uses of shRNA in early to mid 2001 (Compl., ¶ 32).

CSHL is the assignee of the entire right, title, and interest in the patent applications that were eventually filed with the United States Patent and Trademark Office ("PTO") based on Dr. Hannon's inventions. Collectively referred to as the "Hannon Applications," the applications include U.S. patent application numbers: 09/858,862 filed May 16, 2001 ("the '862 application"), 09/866,557 filed March 24, 2001 ("the '557 application"), 10/055,797 filed January 22, 2002 ("the '797 application"), 10/350,798, filed January 24, 2003 ("the '798 application"), 10/997,086 filed November 23, 2004 ("the '086 application"), 11/791,554 filed May 23, 2007, 11/894,676 filed August 20, 2007, 12/152,655 filed May 15, 2008, 12/152,837 filed May 16, 2008; and international patent applications PCT/US01/08435 filed March 16, 2001 ("the '435 PCT application"), PCT/US03/01963 filed January 22, 2003, and PCT/US05/42488 filed November 23, 2005. Also filed based on Dr. Hannon's inventions were U.S. provisional applications 60/189,739, filed March 16, 2000 ("the '739 application") and 60/243,-097, filed October 24, 2000 ("the '097 application").

At the same time that Dr. Hannon was developing his technology; other scientists were also involved in RNAi research and were filing patent applications. One of those scientists was Dr. Andrew Fire, who on July 1, 1999, filed international patent application PCT/US98/27233 (the "Fire

Application"). On January 14, 2003 the PTO approved the Fire Application and Dr. Fire received U.S. Patent No. 6,506,-559 (the "Fire Patent"). The scope of the Fire Patent and whether it covered shRNA and the application of RNAi to mammalian cells is related to the disposition of the instant dispute and is still being argued before the PTO.

In the spring of 2000, Dr. Hannon and Vincent attended another meeting at CSHL concerning, among other things "licensing of the RNAi technology, the RNAi intellectual property strategy, [and] the direction [Dr. Hannon] envisioned the invention to take in terms of its broad applications in mammalian systems, including cultured cells." (Hannon Decl., ¶ 7.) Although it is unclear whether the '739 application was filed prior to this meeting, it is undisputed that the '097 application was filed subsequent to this meeting on October 24, 2000. The '097 application was a "provisional application." A provisional application requires a specification—a written description of the invention—and a drawing of the invention, but does not require formal patent claims or other types of information required in a formal patent application. *See* 35 U.S.C. 111(b). An inventor has one year after the filing of a provisional application to file a formal patent application in order claim a benefit of priority based on the provisional application. *Id.* Certain of the Hannon Applications claim a benefit of priority to the '739 application and the '097 application.

In drafting the '097 application, Vincent copied approximately 11 pages of text from the published Fire Application (together with the similar text of the Fire Patent the "Fire text"). Portions of the Fire text were included in the "Detailed Description of Certain Preferred Embodiments" (the "Detailed Description") of the '435 PCT application, filed on March 16, 2001, the '862 application filed on May 16, 2001, and

the '557 application filed on May 24, 2001. All three of these applications were "directed generally to the initial methods and technologies Dr. Hannon developed relating to the use of RNA interference in mammalian and other cells, including the use of hairpin RNA to regulate target genes." (Compl., ¶ 26.) In particular, the '557 application, a continuation-in-part ("CIP") of the '435 PCT application, was the first of the Hannon Applications to include a set of claims directly related to the use of hairpin RNAs "to inhibit gene expression and expression of such hairpin RNAs in cells of a transgenic non-human mammal." (Compl., ¶¶ 26, 30.)

Between 2001 and 2007, Vincent regularly communicated with Dr. Hannon via email and telephone regarding the Hannon Applications. (Compl., ¶ 31.) "In the course of these discussions, Dr. Hannon provided ample data and other information directed to the stable expression of shRNA in mammalian cells." (Pl. Br. at 4.) For example, Hannon "called Vincent from [his] office or from CSHL on [his] mobile phone on multiple occasions each year .... to enable the preparation of a patent application, or to discuss and comment on drafts of documents so that [he] might ensure that [their] inventions up to that point might be protected." (Hannon Decl., ¶ 8.) In addition, the parties exchanged emails regarding drafts of the Hannon Applications and discussing responses to PTO claim rejections. Finally, on May 25, 2004, January 12, 2006, and January 23, 2007, Dr. Hannon and Vincent met at R & G's Manhattan Offices to discuss various aspects of commercializing and licensing the inventions. Specifically, at the January 23, 2007 meeting, Dr. Hannon recalls being asked "to brainstorm differences between [his] RNAi invention and the invention of Fire." (Hannon Decl., ¶ 12.)

## B. PTO Actions on the Hannon Applications

In an Office Action dated April 21, 2005, the PTO rejected all pending claims in the '557 application because "the specification failed to teach introducing an expression vector encoding a hairpin RNA into mammalian cells." (Compl., ¶ 36.) The Defendants' filed a response to the PTO's rejection and a Rule 132 Expert Declaration. Both cited sections of the copied Fire text "as evidence that the technology invented by Dr. Hannon and described in the '557 application was directed to use of expression systems intended to produce hairpin RNAs upon being transcribed in cells." (Compl., ¶ 36.) On August 11, 2005, the PTO issued a Notice of Allowance for the '557 application claims finding that the Defendants response and the Rule 132 Declaration had resolved the issue by establishing that "the double stranded RNA construct of the patent application encompass hairpin RNA comprising the features claimed therein." (Compl., ¶ 38.)

Subsequently, on April 6, 2006, the PTO decided to reconsider the August 11, 2005 Notice of Allowance for the '557 application, and on September 6, 2006, Examiner McGarry of the PTO rejected all pending claims in the '557 application as anticipated by the Fire Patent. In the patent context, claims are rejected as "anticipated" if "a single piece of relevant prior art contains all the claimed elements, it is said to anticipate the product or process." Herbert Schwartz, *Patent Law & Practice* 73 (5th ed.2006). Prior to responding to the PTO's rejection of the '557 application, Vincent, Dr. Hannon, and John Maroney, the Vice President, Legal Counsel, and Director of CSHL's Office of Technology Transfer met with PTO Examiner McGarry and Supervisory Examiner Schultz at the PTO in Alexandria, Virginia to discuss Examiner McGarry's rejection of the '557 application as anticipated by the Fire Patent. During this meeting Vincent did not disclose to any of the parties that he intended to rely on the Fire text in his response.

On March 9, 2007 Vincent filed an Amendment to the '557 Application arguing that "the Fire Patent failed to provide any particular guidance that would have led one to envisage the claimed methods directed to using an expression vector encoding hairpin RNA to attenuate gene expression specifically in mammalian cells." (Compl., ¶ 40.) In response, in an Office Action dated September 24, 2007, the PTO rejected Vincent's argument and, referring specifically to the copied Fire text in the '557 application, noted that " 'in fact the disclosure of cell/organisms of the instant specification at pages 21–22 is essentially verbatim of the disclosure of Fire et al at column 8[and] it is unclear how applicant claimed invention differs from what has been disclosed by the prior art.' " (Compl., ¶ 42 (quoting the September 24, 2007 Office Action).)

Prior to the filing of the '557 application, Dr. Hannon had conceived of the shRNA methods, although it is unclear whether Vincent was aware of this development. The Plaintiff contends that, had it been aware that Vincent had included the Fire text in the Detailed Description of the '557 application, it would have amended the application to distinguish Dr. Hannon's shRNA technology from the disclosure in the Fire Application. Consequently, it was not until January 22, 2002 that Vincent first included a reference to Dr. Hannon's shRNA technology in the '797 application. Although Dr. Hannon admits that Vincent included a reference to shRNA in the '797 application, he contends that the '797 application does not include an additional disclosure regarding the use of shRNA in mammalian cells. The '797 application, along with the subsequent Han-

non Applications seeking to patent Dr. Hannon's shRNA technology, also included portions of the Fire text in their Detailed Descriptions. Vincent did not cite the Fire Patent as relevant prior art in any submissions to the PTO until he filed Supplemental Information Disclosure Statements in November 2004 and January 2005. (Compl., ¶ 25.)

The PTO rejected the '797 application as being anticipated by the Fire Patent because, according to the Plaintiff, the PTO improperly interpreted—and continues to interpret—the Fire Patent as describing "short hairpins." The Plaintiff contends that the claims in the '797 application specifically define "short hairpins" whereas the Fire Patent describes "long hairpins." During the prosecution of the '557 application Vincent attempted to amend the specification to add an upper limit to the hairpin claims to clearly define them as "short hairpins," but this was rejected by the PTO because it was " 'not consistent with the specification and constitut[ed] new matter where it is not disclosed nor made apparent by the disclosure of the specification that such a specific range was intended.' " (Compl., ¶ 45 (citing an undated PTO action).) The '086 and '676 applications are still pending before the PTO. However, the Plaintiff states that the PTO's belief that the Fire Patent describes "short hairpins" may also lead to the rejection of the pending applications because they are filed from and claim priority to the '797 application.

### C. The Discovery of the Fire text in the Hannon Applications and Vincent's Termination

On March 3, 2008, the Plaintiff became aware that Vincent had copied the Fire text. This occurred as a result of CSHL's internal investigation into the PTO's rejections of the Hannon Applications. The investigation began in February 2008 and was conducted by Dr. Vladimir Drozdoff, a Senior Licensing Associate and Patent Attorney for CSHL's Office of Technology Transfer. After reviewing the September 4, 2007 Office Action rejecting the '557 application as anticipated by the Fire Patent, Dr. Drozdoff compared the specification in the '557 application to the Fire Patent and discovered the similarities. Dr. Drozdoff then conducted a detailed review of the '739 application and the '097 application, which as previously noted are the provisional applications to which some of the Hannon Applications claim priority. The result of Dr. Drozdoff's investigation were as follows:

(1) The "Summary of the Invention" of the '097 application contains approximately 11 pages of text that is almost identical to text found in the Fire application and in the Fire Patent; (2) this text is found in the Fire application in certain portions of 3 pages within the "Summary of Invention" and in certain portions of 13 pages within the "Detailed Description of the Invention"; (3) a substantial portion of this text was carried forward into the specification of the various Hannon Applications; (4) none of the sections of the Hannon Applications where this text appears cite or reference the Fire application; and 95) the Fire application was first disclosed in the '557 prosecution in a November 2004 filed [Information Disclosure Statement].

(Compl., ¶ 53.)

On April 1, 2008, CSHL, represented by Mr. Maroney and Dr. Drozdoff, met with Vincent and R & G partner James Haley at the R & G Manhattan Office to discuss Dr. Drozdoff's findings. At this meeting, Vincent admitted that he had copied portions of the Fire Application into the '097 application. The Defendants told Mr. Maroney and Dr. Drozdoff that they would not assist CSHL any further unless CSHL waived R & G's liability. CSHL refused

to waive R & G's potential liability and thereafter hired Wilmer Cutler Pickering Hale and Dorr, LLP ("Wilmer Hale") to take over prosecution of the Hannon Applications and correct Vincent's misconduct.

In April 2009, after R & G has ceased representing CSHL in prosecuting the Hannon Applications, it terminated Vincent's employment. The basis for the termination was also the subject of a disciplinary investigation in the State of Massachusetts. The charges against Vincent involved a company he founded in April 2002 known as the "The IP Resource Company." The purpose of the IP Resource Company was to perform patent database searches. R & G was not aware that Vincent was associated with the IP Resource Company. It was alleged that between April 2002 and September 2008, Vincent prepared and submitted invoices to R & G for payment for work done by the IP Resource Company, and, because Vincent had signed off on the invoices, R & G processed them for payment. It was further alleged in the disciplinary investigation that, once Vincent received the checks from R & G to the IP Resource Company, he would endorse the checks over to his personal account. Because Vincent did not maintain the underlying billing records for the invoices he submitted on behalf of the IP Resource Company, he is unable to substantiate what services were actually provided. CSHL contends that at least some portions of these invoices were for work performed on behalf of CSHL. On or about July 20, 2009, prior to a decision by the State of Massachusetts on the disciplinary investigation, Vincent voluntarily resigned from the practice of law.

## D. The Instant Action

On February 16, 2010 Plaintiff filed its complaint in the Eastern District of New York, alleging claims of legal malpractice, breach of fiduciary duty and fraud/fraudulent inducement based on the delay and prejudice to the Hannon Applications caused by Vincent's inclusion of the Fire text. Although ultimately unrelated to the instant motion, the Plaintiff also alleges a separate fraud committed by Vincent with regard to the invoices he submitted to R & G from the IP Resource Company relating to work performed for CSHL.

According to the Plaintiff, Vincent knew "from the outset" that the Hannon Applications would need to be distinguished from the Fire Application and the Fire Patent in order to be approved by the PTO. (Compl., ¶ 28.) The Plaintiff alleges that by copying the Fire text, Vincent "failed to fully describe and distinguish Dr. Hannon's shRNA technology, and particularly the successful use of the technology in gene suppression in mammals using shRNA expressed within the cell, from the long-stranded RNA technology disclosed in the Fire Application." (Pl. Br. at 3.) In particular, the Plaintiff points to a statement copied from the Fire text in the description of the Hannon Applications that molecules of the invention could be "at least 25, 50, 100, 200, 300, or 400 bases" in length. According to the Plaintiff, this description relates to the long RNA molecules of the Fire Patent, and therefore does not properly distinguish the short RNA molecules of Dr. Hannon's invention.

In addition, the Plaintiff claims that Vincent had ample opportunity and sufficient information to amend the specification that included the Fire text to clarify the difference between shRNA in mammalian cells and the Fire Patent, but failed to do so. According to the Plaintiff, the inclusion of the Fire text and the failure to adequately distinguish the shRNA prejudiced the Hannon Application by creating the incorrect perception that Dr. Hannon's inventions were not unique, which highly

influenced the PTO's past and potentially future rejections of the Hannon Applications.

The Plaintiff also claims that the Defendants committed malpractice by continuing to include portions of the Fire text in submissions to the PTO while prosecuting the Hannon Applications. It is alleged that portions of the Fire text were used in the Defendants response to the September 6, 2006 PTO Official Action rejecting the '557 application as being anticipated by the Fire Patent. Finally, the Plaintiff claims that the Defendants' failure to inform the Plaintiff that portions of the Fire text had been included in the Hannon Applications prevented it from amending the specification and engaging new attorneys to prosecute the patents. Based on these deficiencies, the Plaintiff claims damages in the form of legal fees for the Defendants' work; the costs associated with the transition from R & G to Wilmer Hale; and lost commercial user license income and lost royalty income of differing amounts based on whether the Plaintiff ultimately obtains a patent.

For their part, the Defendants first argue that the copying of the Fire text could not be responsible for the rejection of the Hannon Applications, because the Hannon Applications were also rejected as being anticipated by patents filed by Dr. Yin–Xiang Li and Dr. Michael Graham. Furthermore, the Defendants contend that it was not the copying of the Fire text that led to the rejection of the Hannon Applications as anticipated by the Fire Patent, but it was the very nature of Dr. Hannon's invention itself. The Defendants claim that "the PTO has consistently interpreted the disclosures in the Fire patent in the same fashion when rejecting (i) the Hannon Applications; and (ii) applications by other scientists who were not represented by Mr. Vincent or by R & G and whose applications did not copy text from Fire." (Defs.' Br. at 7.)

However, the Court does not need to address the merits of the underlying claims because, as discussed below, the Court grants the Defendants' motion to dismiss pursuant to Fed. R. Civ. P(12)(b)(3) for improper venue and transfers this case to the District of Massachusetts.

## II. DISCUSSION

### A. Legal Standard

On a motion to dismiss a complaint under Rule 12(b)(3) for improper venue, "the plaintiff bears the burden of establishing that venue is proper." *French Transit v. Modern Coupon Sys.,* 858 F.Supp. 22, 25 (S.D.N.Y.1994). A court applies the same standard of review in Rule 12(b)(3) dismissals as Rule 12(b)(2) dismissals for lack of personal jurisdiction. *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir.2005). "If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of [venue]." *Id.* (quoting *CutCo Indus. v. Naughton,* 806 F.2d 361, 364–65 (2d Cir. 1986)). Whether to dismiss an action for improper venue is in the district court's sound discretion. *Minnette v. Time Warner,* 997 F.2d 1023, 1026 (2d Cir.1993). On such a motion, the plaintiff has the burden of showing that venue in the forum district is proper. *Solow Bldg. Co. v. ATC Assocs., Inc.,* 175 F.Supp.2d 465, 469 (E.D.N.Y. 2001). In analyzing a claim of improper venue, a court must view all facts in the light most favorable to the plaintiff. *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir.2007). Thus, " 'the Court must accept the facts alleged in the complaint and construe all reasonable inferences in the plaintiff's favor.' " *Matera v. Native Eyewear, Inc.,* 355 F.Supp.2d 680, 681 (E.D.N.Y.2005) (quoting *Fisher v. Hop-*

*kins,* No. 02 Civ. 7077, 2003 WL 102845, at *2 (S.D.N.Y. Jan. 9, 2003)).

### B. Pendent Venue

█ In the complaint, the Plaintiff asserts claims for legal malpractice, breach of fiduciary duty, and fraud/fraudulent inducement. Although all three of these causes of action are grounded in state law, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a) because the legal malpractice and breach of fiduciary duty claims turn on a question of federal patent law—i.e., whether the Hannon Applications are anticipated by the Fire Patent or other prior art. *See Immunocept, LLC v. Fulbright & Jaworski, LLP,* 504 F.3d 1281, 1284–86 (Fed.Cir.2007) (holding that the district court had jurisdiction pursuant to 28 U.S.C. § 1338(a) over a legal malpractice claim that was based upon an alleged attorney error in drafting a patent claim in a manner that narrowed the scope of the patent). The fraud claims relate to the impropriety of the Defendants' actions regardless of whether the Dr. Hannon's inventions are ultimately distinguishable from prior art, and therefore are not considered federal law claims. Although pendent venue is usually addressed after the venue analysis, the Court chooses to address it first to determine which of the two federal claims should control the venue determination.

█ "Whether appending a federal or state claim, under the doctrine of pendent venue, a federal court may *in its discretion* hear pendent claims which arise out of the same nucleus of operative fact as a properly venued federal claim, even if venue of the pendent claim otherwise would not lie." *Hsin Ten Enterprise USA, Inc. v. Clark Enterprises,* 138 F.Supp.2d 449, 462 (S.D.N.Y.2000) (internal quotation marks and citation omitted) (emphasis in original). Where, as here, there are two federal claims, to exercise pendent venue a

court must "determine which of the two federal claims is the 'primary claim,' and apply the venue statute applicable to that claim." *Arma v. Buyseasons, Inc.,* 591 F.Supp.2d 637, 649 (S.D.N.Y.2008) (quoting *Solow Bldg. Co. v. ATC Assocs.,* 175 F.Supp.2d 465, 470 (E.D.N.Y.2001)).

The parties do not dispute that the same acts and omissions by the Defendants form the basis for the legal malpractice and breach of fiduciary claims, and that the fiduciary duty owed by the Defendants is based on their legal representation of the Plaintiff. (Defs.' Br. at 13; Pl.'s Br. at 14; Compl., ¶¶ 68, 75.) In addition, both parties address the venue question as to the legal malpractice cause of action and only discuss the breach of fiduciary duty claim in the context of pendent venue. Thus, the Court finds that, based on the allegations in the complaint and the position taken by the parties, the "primary claim" for the purposes of the below venue analysis is the legal malpractice cause of action.

### C. Whether the Eastern District of New York is the Proper Venue for the Legal Malpractice Claim

█ The Plaintiff asserts that venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) ("section 1391"), which state in relevant part that:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated ...

28 U.S.C. § 1391(b). In the instant action, section 1391(b)(1) is not available to sup-

port venue in the Eastern District of New York because Vincent is a resident of the State of Massachusetts. (Compl., ¶ 3.) In addition, although the Plaintiff asserts that venue is proper under section 1391(b)(2) because a "substantial part of property that is the subject of the action is situated" in the Eastern District of New York, namely the inventions that are the subject of the Hannon Applications, this argument is unavailing.

In support of this contention, the Plaintiff relies on this Court's decision in *Matera v. Native Eyewear Inc.*, 355 F.Supp.2d 680 (E.D.N.Y.2005) (Spatt, J.), which held that venue was proper in the Eastern District of New York because it was where the property subject to the allegedly breached agreement was situated. Contrary to the Plaintiff's interpretation, this rationale was not based on the clause in section 1391(b)(2) relating to "property that is the subject of the action." Rather, this Court determined that the location of the assets was relevant because it indicated where the agreement was to be performed, which is considered a "substantial event" to confer venue in breach of contract cases. *Id.* at 686. Although the inventions are relevant to the ultimate disposition of the Plaintiff's claims, the Court finds that the acts and omissions of the Defendants, and not the inventions themselves, are the "subject" of the Plaintiff's claims. *See Bond Safeguard Ins. Co. v. Ward*, No. 9–CV–093, 2009 WL 1370935, at *5 (N.D.Ga. May 14, 2009) (noting that although the cases addressing this portion of section 1391(b)(2) are "scant" the cases "that do construe the meaning of 'property that is the subject of the action' under subsection (a)(2) to apply only to suits involving property disputes or in rem actions ... not to suits alleging financial damages to a corporation") (internal quotation marks and citations omitted) (collecting cases). Therefore, the remaining issue before this Court is whether, under section 1391(b)(2) "a substantial part of the events or omissions giving rise" to the Plaintiff's legal malpractice claim occurred in the Eastern District of New York.

▇▇▇ Venue can be proper in multiple districts, "as long as 'a substantial part' of the underlying events took place in those districts." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir.2005); *Continental Ins. Co. v. Securi Enters., Inc.*, No. 09–CV–3731, 2010 WL 3702559, at *2 (E.D.N.Y. Aug. 16, 2010) ("Venue is appropriate in each district where a substantial part of the events or omissions occurred, and thus venue maybe appropriate in a given district even if a greater portion of events occurred elsewhere."). Thus, when a plaintiff relies on section 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate: 1) identify the nature of the claims and the alleged acts or omissions giving rise to the claims, and 2) determine whether a substantial part of the acts or omissions occurred in the district where the suit was filed. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir.2005) (citing *Gulf Ins. Co.*, 417 F.3d at 357). "'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Id.* at 432–33.

▇▇▇ Where there are some acts which took place within the plaintiff's chosen forum, they are properly deemed "significant" if they have a "close nexus to the claims." *Id.* at 433. "Only the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a substantial part of the events are to be considered." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir.2003).

Although section 1391(b)(2) does not require that the most substantial part of the events giving rise to the claim occurred in the Eastern District, the Second Circuit has cautioned district courts "to take seriously the adjective 'substantial'" and thus "for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question." *Gulf Ins. Co.,* 417 F.3d at 357 (emphasis in original).

### 1. Step 1: Identify the Nature of the Claims and the Alleged Acts and Omissions

As previously discussed, the relevant claim in the venue analysis is the cause of action for legal malpractice based on the Defendants acts and omissions when drafting and prosecuting the Hannon Applications. According to the complaint, the acts constituting the alleged malpractice were: (1) the actual copying of the Fire text into the Hannon Applications; (2) the failure to otherwise distinguish Dr. Hannon's inventions from the Fire Patent and other prior art; and (3) Vincent's reliance on the Fire text when responding to the PTO's rejection of the Hannon Applications as anticipated by the Fire Patent. In addition, the Plaintiff alleges that Vincent's failure to inform the Plaintiff or the PTO at any point that the Hannon Applications included portions of the Fire text was an omission that constituted malpractice.

### 2. Step 2: Whether a Substantial Part of the Acts or Omissions occurred in the Eastern District of New York

The Plaintiff identifies a number of connections between the Eastern District of New York and the instant litigation that it contends support venue in this Court. In reviewing these connections, the Court is mindful of the difference between a relevant connection to the State for purposes of personal jurisdiction, and "substantial events" that took place in the district for purposes of venue. *See Gulf,* 417 F.3d at 357 ("It would be error, for instance, to treat the venue statute's "substantial part" test as mirroring the minimum contacts test employed in personal jurisdiction inquiries."). First, the Plaintiff claims that the development of Dr. Hannon's inventions, which occurred at CSHL in the Eastern District of New York, constituted a "critical event" because, as the subject of the Hannon Applications, the claim could not exist without it. Second, the Plaintiff argues that the preliminary meetings at CSHL on October 9, 1999 and in the spring of 2000, as well as the subsequent meetings at R & G's Manhattan Office were substantially related to the drafting of the Hannon Applications, and therefore to the underlying malpractice claim. Finally, the Plaintiff contends that the numerous conversations between Dr. Hannon and Vincent where Dr. Hannon discussed the inventions and Vincent allegedly assured him that his invention was being protected, as well as the drafts of the patent applications sent between the parties, all constitute substantial events underlying the legal malpractice claim.

Conversely, the Defendants argue that: the location of Dr. Hannon's invention is irrelevant to the underlying malpractice claim; the meetings that took place at CSHL in October 1999 and Spring 2000 were preliminary and unrelated to the malpractice claim; and, not only do the telephone conversations and emailed drafts not constitute substantial events, but that the Defendants location is the only relevant location for determining venue based on those communications. Furthermore, the Defendants assert that, to the extent Vincent worked out of R & G's Manhattan office or any substantive meetings took place at R & G's Manhattan office, venue would be proper in the Southern District and not the Eastern District of New York.

In support of their positions, the parties present opposing characterizations of the underlying dispute. While the Plaintiff attempts to describe the Defendants' alleged acts and omissions broadly as if they occurred in the context of a contract dispute, the Defendants take a more narrow interpretation, arguing that each allegation of malpractice ought to be treated as a discrete act. As the analysis in the cases cited by both parties make clear, how the Court ultimately characterizes the nature of the dispute will determine whether venue is proper in the Eastern District of New York.

For example, the Plaintiff primarily relies on cases such as *Sacody Technologies, Inc. v. Avant, Inc.,* 862 F.Supp. 1152 (S.D.N.Y.1994), where the court had to determine whether venue was proper in the Southern District of New York in a dispute involving allegations that the defendant breached a confidentiality agreement. In breach of contract cases, courts "consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *City of New York v. Cyco.net, Inc.,* 383 F.Supp.2d 526, 543 (S.D.N.Y.2005). Thus, if, as the Plaintiff claims, this case should be treated as a contract dispute, the Court would consider where the entirety of the patent applications were discussed and drafted, and whether CSHL could be considered the location where the patent would be "performed."

Furthermore, courts have routinely held in the context of contract dispute cases that venue under § 1391(a)(2) "may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action." *Constitution Reins. Co. v. Stonewall Ins. Co.,* 872 F.Supp. 1247, 1249 (S.D.N.Y.1995) (internal quotations omitted); *Sacody,* 862 F.Supp. at 1157 (holding venue requirements satisfied by receipt of correspondence and telephone calls in forum district even though conduct constituting "breach" of Confidentiality Agreement occurred outside of forum state); *Sea Tow Servs. Intern., Inc. v. Pontin,* 472 F.Supp.2d 349, 364 (E.D.N.Y. 2007) ("First, it is undisputed that negotiations regarding the Agreement were performed via telephone and written communication by Pontin and Sea Tow in Florida and in the Eastern District of New York, respectively. As such, the Court finds that the Agreement was negotiated, at least in part, in New York."). Therefore, if characterized as a contract dispute, the preliminary meetings, general conversations, and exchanges of drafts would be particularly relevant to the venue determination.

Conversely, the Defendants rely on cases decided in the more traditional legal malpractice context, where, although not a bright line rule, most courts have found that the alleged malpractice, not the entire attorney-client relationship is the relevant inquiry. The location of the attorney is not only relevant to the where the legal work was performed, but is also relevant in regards to any communications. *See, e.g., Astor Holdings, Inc. v. Steefel, Levitt & Weiss, P.C.,* No. 03–CV–1242, 2003 WL 21108316, at *7 (S.D.N.Y. May 14, 2003) (holding that venue was not proper in the Southern District of New York where the plaintiff resided because the allegedly erroneous advice to file a case in New York that could result in a finding of civil contempt against the plaintiff, originated from the defendant's office in California); *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.,* 927 F.Supp. 731, 736 (S.D.N.Y.1996). (holding that venue was improper in the Southern District of New York because "[a]ny extortion, malpractice, misrepresentation, fraud/con-

spiracy, unethical conduct, or breach of fiduciary duty which defendants may have committed against plaintiffs would have been committed in Pennsylvania or Delaware, where defendants reside and where they prepared for and litigated the Underlying Action, and venue would be appropriate in a district in one of those states pursuant to 28 U.S.C. § 1391(a)(1) or (2)"); *Club Vista Fin. Servs., LLC v. Maslon, Edelman, Borman & Brand, LLP,* 10–CV–264, 2010 WL 3021889, at *6 (D.Nev. July 29, 2010) (granting a motion to transfer venue under § 1404(a) and noting that the action giving rise to the legal malpractice claim is the legal work performed, and therefore venue is proper in the location of the legal representation); *but see Stewart v. Stoller,* No. 7–CV–552, 2008 WL 4168519 (D.Utah Aug. 28, 2008) (holding that venue in a legal malpractice action was proper in Utah where the plaintiff resided, despite the fact that the attorneys were located in California because the plaintiff had "telephone conversations and corresponded with each of the Defendants from Utah" and therefore the attorneys had "purposefully and regularly directed their contacts toward a Utah resident when they were retained and throughout their handling of the Infringement Action").

Viewing the facts in the light most favorable to the Plaintiff, the Court finds that the allegations are more consistent with a typical legal malpractice case than a contract dispute. Here, it is clear that the Plaintiff hired the Defendants to assist them in obtaining patents on Dr. Hannon's inventions. Viewing a patent prosecution as one might view any other type of litigation, the Defendants' job was to present the Plaintiff's arguments in support of its patent applications to the PTO in Virginia, and defend against objections. Similar to a lawyer's goal in litigation of obtaining a favorable judgment for his client, the Defendants goal was to obtain a favorable outcome in the form of a patent for CSHL.

Thus, the Court will look at the events directly resulting in the underlying legal malpractice claim, as opposed to any event related to the drafting of the Hannon Applications. Therefore, regardless of the location of the Plaintiff or Dr. Hannon's invention, the Second Circuit "has made clear that when a court examines the question of whether venue in a forum is proper, it must focus on where the *defendant's* acts or omissions occurred." *Prospect Capital Corp. v. Bender,* No. 09–CV–826, 2009 WL 4907121, at *3 (S.D.N.Y. Dec. 21, 2009) (emphasis in original) (citing *Daniel v. American Bd. of Emergency Medicine,* 428 F.3d 408, 434 (2d Cir.2005)).

Vincent performed the majority of his work preparing the Hannon Applications and responding to PTO Official Actions from his office at R & G in Massachusetts. On a few occasions Vincent worked in R & G's Manhattan Offices, and on at least one occasion he presented arguments to the PTO in support of the Hannon Applications at the PTO offices in Virginia. The telephone conversations, emails, and the draft patents exchanged between the parties served the function of providing Vincent with information to perform the actual drafting and prosecution of the patents, but his actions that allegedly constituted malpractice did not occur in the course of these communications. *Cf. Furr v. Aguilar,* No. 04–CV–2385, 2005 WL 1801627 (D.Colo. July 28, 2005) (finding that a California law firm's telephone conversations with the plaintiff in Colorado informing him of the status of the case and any offers to settle supported venue in Colorado because the alleged malpractice—namely that the Defendants "erroneously interpreted the offer to settle" and incorrectly advised the Plaintiff about the settlement—directly occurred in those conversations).

This analysis is also applicable to the claim that Vincent committed legal malpractice by fraudulently omitting to inform the Plaintiff that he had copied portions of the Fire text. This allegation is essentially that Vincent committed malpractice by not disclosing his malpractice. While the omission may be relevant to the damages the Plaintiff sustained, the Court cannot find that it supports venue. Assuming the Plaintiff's allegations are true, Vincent knew from the moment he copied the Fire text into the first Hannon Application that he was performing an improper act. Finding venue in the Eastern District of New York solely based on the Defendants failure to inform the Plaintiff of the alleged malpractice in telephone conversations would lead to a rule where venue always existed where a plaintiff resides so long as there are any communications where the defendant had an opportunity to and failed to disclose the malpractice.

Such a rule would not comport with the purpose of the venue statute to "protect[ ] a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1576 (Fed.Cir.1990); *see also Henrich v. Field*, No. 05–CV–0798, 2006 WL 2620043, at *2 (W.D.N.Y. Sept. 13, 2006) ("Moreover, if Defendants breached their fiduciary duties to Henrich by failing to keep him apprised of information of which he should have been made aware, those omissions occurred in Delaware."); *McArdle v. Carter*, No. 09–CV–927, 2010 WL 2683375, at *5 (M.D.Ala. July 6, 2010) (holding that the district where the defendant attorneys' office was located was the proper venue because the "Defendants' omissions relate[d] to their failure to communicate, from their office in Savannah, the details of the ongoing case").

Finally, the Plaintiff does cite one non-contract related case, *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865 (2d Cir.1992), which found that a communication received in a district could constitute a "substantial event." In *Bates*, the defendant was accused of violating the Fair Debt Collection Practices Act when it sent a collection notice to the plaintiff in Pennsylvania, where he had incurred his debt, which was then forwarded by the postal service to the plaintiff's new residence in the Western District of New York. *Id.* at 866. The Second Circuit held that the receipt of the collection notice in the Western District of New York was properly considered a "substantial event" because the underlying claim could not have occurred if the collection notice had not been received, and because forwarding collections to the district was an important part of the collection process that was the core of the alleged violation. *Id.* at 868. Notably, in *Bates*, the Second Circuit identified a direct relationship between the event in the Western District of New York and the underlying Fair Debt Collection Practices Act claim that made the act "substantial." Here, the meetings, telephone conversations, and emails are at most tangential to the underlying legal malpractice claim.

The first CSHL meeting took place on October 7, 1999, where the Plaintiffs' contend that Hannon and Vincent were present for "discussions centered around, among other things, patenting strategies for RNA interference" and that shortly thereafter CSHL engaged Vincent to handle the eventual patent application. (Pl. Br. at 9, Hannon Decl., ¶ 6.) The second CSHL meeting took place in the Spring of 2000, where Hannon states he discussed with Vincent his vision for the invention in terms of "broad applications in mammalian systems, including cultured cells" and that "[f]rom this meeting, Vincent should have understood the substantial advantages pro-

vided by [his] invention and its value as a tool for research in mammalian systems, including cells and whole animals." (Decl., 7).

However, although the parties may have discussed the invention generally and the potential distinguishing factors, the CSHL meetings appear to have occurred early in the process while Dr. Hannon was still developing the technology and did not directly contribute to the underlying malpractice. *See Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison*, No. 92–CV–9002, 1994 WL 74860, at *4 (S.D.N.Y. March 7, 1994) (finding that meetings in the Southern District of New York where the parties discussed the California state court action was not a substantial event giving rise to the malpractice claim because the meetings were not related to conduct that constituted the alleged malpractice). Moreover, there is no allegation that Vincent failed to understand the unique aspects of Dr. Hannon's inventions, but rather that he was aware of the need to distinguish the Fire Application and the Fire Patent "from the outset" and yet, nevertheless, he copied the Fire text. (Compl., ¶ 28.)

With regard to the electronic communications, the Defendants contend that "phone calls and emails from Vincent to CSHL, involving assurances that Hannon's alleged inventions were 'being protected' based on Vincent's 'years of experience as a patent lawyer['] and discussions of 'critical aspects of prosecution strategy'" do not constitute significant events giving rise to the legal malpractice claim. (Def. Reply Br. at 2.) Conversely, the Plaintiffs argue that these communications were substantive exchanges directly relating to the description and distinguishing features of the technology that form the basis of their legal malpractice claims.

Courts analyzing venue in legal malpractice cases have required that the communi-cations actually relate to the specific allegation of malpractice, not the underlying action or document generally. For example, in *Trico Bancshares & Subsidiaries v. Rothgerber Johnson & Lyons LLP*, No. 2:09–CV–01700, 2009 WL 3365855, at *3 (E.D.Cal. Oct. 15, 2009), the alleged legal malpractice related to the omission of a single employee cap provision from a stock option plan prepared by the defendants, which resulted in the plaintiff's paying an additional $440,000 in California and federal income taxes. In *Trico*, the plan containing the omission "was researched, drafted and revised in [the defendant's] Colorado office." *Id.* at *1. In addition, "in connection with preparing the plan, numerous phone calls were made between the offices of [plaintiff] in Chico, California and [defendant] in Colorado." *Id.* (citation omitted). The court held that phone calls between the parties did not support venue in California, because the plaintiff failed to show how the calls were substantially related to their professional negligence claims. *Id.* at *3.

The Court notes that the *Trico* court ultimately found that venue was proper in California under Ninth Circuit precedent that the "locus of the injury," could constitute a substantial event giving rise to the underlying tort claim. *Id.* at *3–4. However, *Trico* is not binding and this Court finds that venue determinations based solely on the location of the harm is contrary to Congress's intent in drafting section 1391(b) and the Second Circuit's directive that the venue analysis should focus on the relevant activities of the defendants. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir.2005); *Astor Holdings, Inc. v. Roski*, 2002 WL 72936, at *9 (S.D.N.Y. Jan. 17, 2002) ("There is an obvious potential for unbounded venue if the courts were to find venue regardless of where the acts occurred, based solely on the existence of economic harm felt in the district where

the plaintiff resides or is headquartered."); *MB Financial Bank, N.A. v. Walker,* 741 F.Supp.2d 912, 2010 WL 3791975 (N.D.Ill. Sept. 23, 2010) ("If the situs of a plaintiff's economic injury were dispositive, §§ 1391(a)(1) and 1391(a)(3) would be superfluous.... A plaintiff could always sue in its home district because, after all, home is where the wallet is. Moreover, Congress amended § 1391 specifically to remove the plaintiff's home from the venue equation.") (citations omitted).

Here, accepting as true the Plaintiff's version of the communications, the parties engaged in discussions about the benefits of the inventions and the general prosecution of the patents. These conversation did not "directly give rise" to the alleged malpractice. *Jenkins Brick Co. v. Bremer,* 321 F.3d 1366, 1371 (11th Cir.2003). Because the conversations between Hannon and Vincent occurred after Vincent first copied the Fire text, which the Plaintiff alleges Vincent knew was improper "from the outset," and did not otherwise directly relate the Fire text, the conversations were, at most, tangentially related to the continued inclusion of the Fire text in the Hannon Applications, and therefore did not constitute a substantial event. *See Astor Holdings, Inc. v. Steefel, Levitt & Weiss, P.C.,* 2003 WL 21108316, at *7 (S.D.N.Y. May 14, 2003) ("The advice given at the May 2001 meeting, even if it were to continue the New York action, was tangential to the core of the alleged malpractice, which was the advice to file the action in the first place. The advice given at the May 2001 meeting cannot be considered a *substantial* part of Steefel's overall malpractice, the majority of which occurred in California.") (emphasis in original); *see also Loeb v. Bank of Am.,* 254 F.Supp.2d 581, 587 (E.D.Pa.2003) (holding, in a legal malpractice case where defendants allegedly failed to disclose a conflict of interest, that "incidental events, such as the correspondence and calls [plaintiff] relies on, that have only some tangential connection with the dispute in litigation [were] not enough" to support venue where the plaintiff resided); *Circle Group Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A.,* No. 01–CV–7338, 2002 WL 1559637, at *3 (N.D.Ill. July 16, 2002). ("The two meetings in Illinois, and defendants' communications with Circle Group by telephone, fax, mail, and e-mail, are more tangential than substantial and are thus insufficient to establish venue here.").

Thus, because the Defendants did not commit any of the alleged acts or omissions underlying the legal malpractice claim in the Eastern District of New York, and any relevant communications were tangential to the legal malpractice claim, venue is not proper in the Eastern District of New York. In addition, having found that venue is not proper as to the legal malpractice claim, the Court declines to address whether the venue determination would have been different for the breach of fiduciary duty claim. Finally, as to the state causes of action for fraud and fraudulent inducement, "[t]he doctrine of pendent venue is ordinarily employed where venue is lacking for a state law claim that arises from the same nucleus of operative facts as a 'properly venued' federal claim." *Hsin Ten Enterprise USA, Inc. v. Clark Enterprises,* 138 F.Supp.2d 449, 462 (S.D.N.Y.2000) (citation omitted). Insofar as there is no "properly venued" federal claim, the Court does not need to reach the question of whether venue is proper as to the fraud cause of action. Thus, the Court grants the Defendants' motion to dismiss for improper venue in that a transfer of venue is required.

**D. Whether the Case Should be Transferred Pursuant to 28 U.S.C. § 1406(a)**

The Defendants ask this Court to dismiss the case and neither party has re-

**560**

quested transfer pursuant to 28 U.S.C. § 1404. However, when a case is brought where venue is improper, a district court may "if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The decision to transfer such a case is within the discretion of the district court. *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir.1993). Given the substantial amount of discovery that has already taken place and in order to avoid any prejudice to the Plaintiff with regard to statutes of limitations, the Court finds that it is in the interest of justice to transfer this case to the District of Massachusetts, where Vincent drafted the Hannon Applications and other PTO submissions that contained portions of the Fire text.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(3) for improper venue is granted, without prejudice, and it is further

**ORDERED,** that the case be transferred to the District of Massachusetts for further proceedings.

**SO ORDERED.**